UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACEY LAFFERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:09cv1045 (MRK) |
| | : | |
| OWENS, SCHINE & NICOLA, P.C. and | : | |
| ROBERT J. NICOLA, *individually*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION**

Plaintiff Stacey Lafferty brings suit against her former employer, Owens, Schine & Nicola, P.C. ("OSN"), and her former supervisor, Robert J. Nicola (collectively "Defendants"). Ms. Lafferty alleges that she suffered an adverse employment action due to her pregnancy in violation of Title VII of the Civil Rights Act of 1964, § 42 U.S.C. § 2000e *et seq.* ("Title VII"), specifically as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA"), and in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA").

Had the parties communicated more effectively, this lawsuit might have been avoided and Ms. Lafferty might still be a valued member of OSN. Now, however, Ms. Lafferty's discrimination and retaliation claims against OSN are based on he-said-she-said disputes that require the kind of credibility assessment best suited to a jury. However, it does appear that the Court may dismiss the claims against Mr. Nicola as an individual. Not only has Ms. Lafferty failed to exhaust administrative remedies as to Mr. Nicola, the Court holds that the alter ego

doctrine does not operate to impose individual liability in Title VII actions, and Ms. Lafferty has not adequately stated a CFEPA action against Mr. Nicola as an individual.

Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. # 96]. Ms. Lafferty's claims against Mr. Nicola as an individual are dismissed; Ms. Lafferty's claims against OSN will proceed to trial for a jury determination.

## I.

The following facts are culled from the parties' Local Rule 56(a) Statements [docs. # 98, 110], affidavits, and exhibits. The Court presents all facts "in the light most favorable to the non-moving party"—here, Ms. Lafferty—after drawing "all reasonable inferences in [her] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted). Additional facts are discussed in the analysis where relevant.

OSN is a professional corporation, organized and existing pursuant to the laws of Connecticut. Mr. Nicola is the President of OSN, and Rose Zmarzlak is its Corporate Secretary. OSN hired Ms. Lafferty in May of 2003 as an at-will employee. In 2006, when Ms. Lafferty became pregnant with her first child, the only attorneys at OSN were Mr. Nicola, Ms. Lafferty, and John Spielman. Mr. Spielman left OSN in March 2007, approximately one month before Ms. Lafferty commenced her maternity leave.

Prior to her pregnancy, Ms. Lafferty enjoyed a positive working relationship with Mr. Nicola and felt that she was a valued member of OSN. Indeed, Ms. Lafferty fully expected to be made a partner at some point, although she and Mr. Nicola never specifically discussed partnership, and Ms. Lafferty believed that Mr. Nicola was supporting her development because

he wanted her to be a long-term member of the firm.[1] Ms. Lafferty does not allege that she experienced any discrimination due to her pregnancy prior to her maternity leave.

Ms. Lafferty planned on working through her due date, but upon the advice of her doctor she began her maternity leave approximately one month early, on April 9, 2007. On that date, Ms. Lafferty met with Mr. Nicola to discuss her doctor's bed rest order. During that meeting, there was no discussion of the length of her maternity leave or of how or if she would be compensated during her leave. Ms. Lafferty testified in her deposition that, at one point in the meeting, she began crying, and Mr. Nicola said "'God, you're like one of my divorce clients'" while putting a tissue box on his desk. Pl.'s Statement of Material Facts [doc. # 110-1] Ex. 1 at 89 (11/11/10 Lafferty Dep.). After Ms. Lafferty went on leave, Mr. Nicola was the firm's only attorney.

Ms. Lafferty gave birth on April 29, 2007. She does not dispute that she was paid for the two weeks she was on bed rest prior to giving birth and for the twelve weeks following the birth of her daughter.

At some point while Ms. Lafferty was on maternity leave, she was removed as an authorized signatory on OSN's bank account. Defendants maintain that Ms. Zmarzlak made this decision because Mr. Spielman had left and needed to be removed as an authorized signatory, the bank required that all previous signatories be removed and that all new signatories sign new signature cards, and Ms. Lafferty was unavailable to execute the new signature card because she

---

[1] Although members of the firm commonly use the terms "associate" and "partner" in their depositions, and although Mr. Nicola allegedly introduced Ms. Lafferty to clients as his partner, it appears that OSN was restructured to formally eliminate the traditional partnership system. Mr. Nicola denies that he is a partner at OSN and instead states that he is merely a W-2 employee, like other firm attorneys.

was on leave. Ms. Lafferty notes that no one ever inquired to see if she was able to sign a new signature card.

For the month following the April 9, 2007 meeting, there was no communication between Ms. Lafferty and Mr. Nicola. Ms. Lafferty maintains that she called him numerous times, but that he never returned these calls. Mr. Nicola similarly states that he called her, but that he only reached the answering machine.

On May 22, 2007, Mr. Nicola sent Ms. Lafferty a letter—the first concrete evidence of communication between the parties since April 9, 2007. The letter stated that Mr. Nicola had heard nothing from Ms. Lafferty regarding her plans for returning, that she had no rights to maternity benefits per the employee handbook, but that he was nonetheless paying her in full for seven weeks and at a 50% reduced rate for five weeks for a total of twelve weeks paid period. It closed by stating: "Hopefully in the next six weeks you will have a better idea of what you want to do and the time frame to accomplish the same." Pl.'s Statement of Material Facts [doc. # 110-8] Ex. 7. Mr. Nicola testified at his deposition that he expected Ms. Lafferty to return to work on July 16, 2007. *See* Nicola Aff. [doc. # 99] ¶¶ 12, 32; Pl.'s Statement of Material Facts [doc. # 110-4] Ex. 4 at 152 (Nicola Dep.).

On June 6, 2007, Ms. Lafferty responded by letter that her plan was to return full time beginning September 4, 2007. She noted that she had arranged child care and did not expect to be paid from July 16, 2007 through September 4, 2007 unless she started working from home, as—the letter claims—she and Mr. Nicola had previously discussed. The letter stated, "I am ready to start working from home whenever you are ready for that to begin. We can talk about how to accomplish getting the work between my house and the office. . . . Whatever you think is best is what we'll do." Pl.'s Statement of Material Facts [doc. # 110-9] Ex. 8. The letter closed by

noting that Ms. Lafferty had left a few messages to check in on how things were going, how Mr. Nicola was, and to discuss "these issues"—i.e. her return date—and stating that she did not wish to continue leaving messages. Ms. Lafferty asked Mr. Nicola to call her when he could and stated that she looked forward to hearing from him.

Defendants state that at some point after receiving Ms. Lafferty's June 6, 2007 letter, which Mr. Nicola viewed as a unilateral decision to take five months off, Mr. Nicola in his role as President decided to terminate Ms. Lafferty's employment. *See* Nicola Aff. [doc. # 99] ¶ 34.

On July 6, 2007, Ms. Zmarzlak sent Ms. Lafferty an e-mail stating that Mr. Nicola had been extremely busy, that she had given him Ms. Lafferty's number a few days ago, and that he had asked her to remind him to call Ms. Lafferty. The letter also asked about the status of a deposition. The letter made no mention of Mr. Nicola's decision to terminate Ms. Lafferty's employment.

On July 23, 2007, Mr. Nicola sent Ms. Lafferty a letter noting that she had not returned his call of July 16, 2007, but that he understood from Ms. Zmarzlak that Ms. Lafferty had been traveling. The letter observed that there had been little communication over the past three and a half months, that the personal injury files he had taken over had not been handled as he would have liked them to be, and that she would in the future be paid hourly according to how OSN was using her time. Mr. Nicola stated that he would continue to pay her medical insurance if she elected to continue with OSN, that she would remain on payroll in order to remain on OSN's health insurance, and that OSN would pay one-half of her social security and medicare contributions. The letter closed with a request that Ms. Lafferty call him when she returned from vacation.

The Defendants characterize this letter as a notice of termination. Ms. Lafferty stated at her deposition that she "took [the letter] to mean that I was losing my job, as I knew it. That [Mr. Nicola] was demoting me essentially to this contract worker and trying to get me out of this firm . . . ." Pl.'s Statement of Material Facts [doc. # 110-1] Ex. 1 at 115 (11/11/10 Lafferty Dep.). Despite this, Ms. Lafferty received no documentation indicating that her employment had ended and, upon her later return to OSN, she was not required to fill out any paperwork about a change in position.

During Ms. Lafferty's leave, OSN contracted with Dennis Kokenos, Mr. Nicola's future son-in-law, to provide support. On or around July 29, 2007, OSN hired Mr. Kokenos.

On August 14, 2007, Ms. Lafferty and Mr. Nicola met to discuss Mr. Nicola's July 23, 2007 letter. The parties dispute what occurred at the meeting, including whether Mr. Nicola stated that Ms. Lafferty's daughter was now going to be her first priority and whether Mr. Nicola stated that he wanted to bring her job responsibilities more in line with Ms. Lafferty's role as a mother. Both sides agree, however, that Ms. Lafferty begged for her old position back and that it was agreed that she could return on a temporary basis. Ms. Lafferty took this offer hoping that, once she returned, everything would return to normal and she would be able to keep her prior position.

When Ms. Lafferty returned to work, she returned as a salaried employee, and OSN continued to pay Ms. Lafferty's insurance benefits. However, Ms. Lafferty was instructed and encouraged to actively pursue other employment. She appears to have gone on three to five interviews with other firms, but she refused Mr. Nicola's offer to put in a good word at a firm for which she had no interest in working.

At some point, Mr. Nicola inquired as to Ms. Lafferty's ability to try cases, given that she needed to express milk. On September 26, 2007, Ms. Lafferty alleges that Mr. Nicola referred to her as "Pumper Girl." She made a handwritten note, which states in full: "'The Pumper Girl' 9-26 1:52 pm. Rose in office. Dennis could here [*sic*]." *See* Pl.'s Statement of Material Facts [doc. # 110-15] Ex. 14. Both Ms. Zmarzlak and Mr. Kokenos deny hearing Mr. Nicola make this remark.

In December 2007, Ms. Lafferty did not receive a bonus, as she had the prior four years. In early January 2008, when Ms. Lafferty had not located other employment, she was given the choice of becoming an hourly employee or being laid off. On January 18, 2008 her status was changed from that of a salaried employee to that of an independent contractor.

In late January 2008, OSN hired Edward Walsh. Mr. Walsh took Ms. Lafferty's old office next to Mr. Nicola's office; Ms. Lafferty was moved across the floor to Ms. Zmarzlak's old office; Ms. Zmarzlak moved upstairs.

On February 19, 2008, Ms. Lafferty—represented by counsel—filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). She named only OSN as a respondent. In her CHRO complaint, Ms. Lafferty stated that her salary had been reduced, her bonus had been eliminated, her opportunity for partnership had been withdrawn, her job had been terminated and she had been made a contract attorney at a much lower rate of compensation, and that her office had been given away to a male attorney. *See* Pl.'s Statement of Material Facts [doc. # 110-16] Ex. 15.

On March 25, 2008, Ms. Lafferty gave Mr. Nicola her resignation letter, detailing how she felt she had been mistreated. She felt that she had no choice but to end her contract relationship with OSN because of her "reduction in pay" and "the overall feeling of humiliation"

she suffered. Pl.'s Statement of Material Facts [doc. # 110-2] Ex. 2 at 84 (2/15/11 Lafferty Dep.). In April 2009, Ms. Lafferty formed The Lafferty Law Firm, P.C., where she currently works.

Carolyn Linsey, a former OSN partner, stated at her deposition that she knew of other employees who left OSN shortly after returning from maternity leave, including a staff member who "was not wanted back" after she went on maternity leave; a secretary who may have had her pay reduced and was given more menial tasks after she returned from maternity leave; and a paralegal who did not return after her maternity leave because Mr. Nicola refused to be flexible about her return date.

## II.

This Court applies a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[ ] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). A "material fact" is one whose resolution will affect the ultimate determination of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See id.*; *see also Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub*, 202 F.3d at 178 (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," and instead "must come forward with specific

8

facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quotation marks omitted) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Second Circuit has cautioned that district courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and quotation marks omitted). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.* "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quotation marks omitted).

### III.

Title VII prohibits discrimination against any individual on the basis of sex, 42 U.S.C. § 2000e-2(a)(1), and further provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Like other claims of employment discrimination, claims under the PDA that cannot be directly proven are analyzed under the three-step burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Wills-Hingos v. Raymond Corp.*, 104

9

F. App'x 773, 774-75 (2d Cir. 2004) (summary order) (citing *Kerzer v. Kingly Mfg.* 156 F.3d 396, 400 (2d Cir. 1998)).

After the plaintiff makes out a *prima facie* case by a preponderance of the evidence, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the adverse action. *See Gladwin v. Pozzi*, 403 F. App'x 603, 606 (2d Cir. 2010) (summary order) (applying *McDonnell Douglas* standard in pregnancy discrimination case). "The burden is satisfied if the employer articulates a clear and specific reason which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (quotation marks omitted). If the defendant does so, "the burden shifts back to [the] plaintiff who must prove that a discriminatory reason was the actual reason for the employment action." *Id.* "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000).

"Pregnancy discrimination claims under CFEPA are analyzed similarly to claims under Title VII." *Canales v. Schick Mfg., Inc.*, No. 3:09cv253 (MRK), 2011 WL 4345006, at *1 (D. Conn. Sep. 15, 2011) (citing *Levy v. Comm'n of Human Rights & Opportunities*, 236 Conn. 96, 103 (1996)).

## IV.

### A.

Ms. Lafferty must first establish a *prima facie* case of pregnancy discrimination by showing that "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) [either] her position remained open and

was ultimately filled by a non-pregnant employee . . . [or] the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998) (internal citations and quotation marks omitted). A plaintiff's burden in establishing a *prima facie* case of discrimination is *de minimis. See id.* The discriminatory reason need not be the sole, or even the principle, reason for the employment decision; an employment decision violates the federal and state statute if a discriminatory reason is one of many motivating factors for the decision. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003).

Defendants concede, for the purposes of this motion only, that Ms. Lafferty has either satisfied the requirements or raised sufficient questions of fact to allow the question of whether she has established a *prima facie* cases to proceed to a jury.[2]

B.

Assuming Ms. Lafferty has established a *prima facie* case of discrimination, the burden shifts to Defendants to articulate a legitimate nondiscriminatory reason for terminating her employment. *See Gladwin*, 403 F. App'x at 606. Defendants' burden is one of production, not persuasion and "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Defendants have proffered a legitimate, non-discriminatory reason for Ms. Lafferty's termination as a full-time salaried employee: she failed to timely communicate when she planned to return to work and she unilaterally decided to take five months of leave. Defendants have therefore cleared the low hurdle of production.

---

[2] As a result, there is no need for the Court to address the parties' dispute over whether Mr. Kokenos or Mr. Walsh were hired to replace Ms. Lafferty, though a reasonable juror could find that either individual was hired with that intention.

C.

As Defendants have proffered a legitimate business reason for terminating Ms. Lafferty's employment, "the burden shifts back to [the] plaintiff who must prove that a discriminatory reason was the actual reason for the employment action." *Gladwin*, 403 F. App'x at 606. Such pretext may be demonstrated either by reliance on the evidence comprising the *prima facie* case or by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Polito v. Tri-Wire Eng'g Solution, Inc.*, 699 F. Supp. 2d 480, 492 (E.D.N.Y. 2010) (quotation marks omitted). Evidence of pretext alone will not be sufficient; the plaintiff must show that the employer's explanation is mere pretext for an impermissible discriminatory motive. *See McDonnell Douglas*, 411 U.S. at 804. For purposes of summary judgment, the plaintiff must "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [its action] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original).

First, a reasonable juror could find that Defendants' proffered reason is pretextual on its face. It appears that Mr. Nicola never asked Ms. Lafferty to timely explain when she would return to work nor expressed his assumption that Ms. Lafferty would take only 12 weeks of maternity leave; instead, in his May 22, 2007 letter he appeared to invite Ms. Lafferty to propose the length of her leave. *See* Pl.'s Statement of Material Facts [doc. # 110-8] Ex. 7 ("Hopefully in the next six weeks you will have a better idea of what you want to do and the time frame to

accomplish the same."). Mr. Nicola never stated that Ms. Lafferty's leave would end at after twelve weeks; only that her paid leave would cease.

Meanwhile, Ms. Lafferty's letter of June 6, 2007 might be read as taking that as an invitation to propose her ideal situation, which was to take five months off. This "proposal" reading—as opposed to the Defendants' "demand" reading—is somewhat supported by the fact that Ms. Lafferty repeatedly noted that she was prepared to begin working from home whenever OSN wished and that she hoped to discuss the question of her leave further with Mr. Nicola. *See* Pl.'s Statement of Material Facts [doc. # 110-9] Ex. 8 ("I am ready to start working from home whenever you are ready for that to begin. We can talk about how to accomplish getting the work between my house and the office. . . . Whatever you think is best is what we'll do."). Additionally, reading the facts and drawing all reasonable inferences in Ms. Lafferty's favor, the fact that Mr. Nicola never was in touch with Ms. Lafferty after she left for bed rest in April 2007 and the fact that she was removed as an OSN signatory during her leave are suspect. A reasonable juror could therefore conclude that Ms. Lafferty never unilaterally decided to take five months of maternity leave, but merely offered that as a proposal that Defendants were free to reject.

Second, Ms. Lafferty offers circumstantial evidence of discrimination. Given that Ms. Lafferty continued working as a salaried employee through the end of December 2007, a reasonable juror could find that her employment as a full-time attorney at OSN was not altered until she was given a choice between becoming an hourly employee or being laid off in January 2008.

If a reasonable jury so determines, Mr. Nicola's alleged discriminatory comments (that Ms. Lafferty's first priority would now be her daughter, that they would arrange her work to be

more in line with the fact that she was now a mother, questioning whether Ms. Lafferty could handle trials, and the "Pumper Girl" comment) become highly relevant as possible evidence of Mr. Nicola's discriminatory intent. Many factors are considered when determining if comments are evidence of unlawful discrimination or are merely "stray remarks." These factors include, but need not be limited to, "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." *Hall v. Family Care Home Visiting Nurse & Home Care Agency, LLC*, 696 F. Supp. 2d 190, 199 (D. Conn. 2010) (quotation marks omitted). Assuming that Ms. Lafferty's employment was not altered until January 2008, all of these factors either weigh strongly or mildly in her favor. Taken together, a reasonable juror could find that the remarks give rise to an inference of discrimination.

However, even if Mr. Nicola's alleged statements are more accurately classified as "stray remarks," they are still relevant. While "stray remarks"—even when made by a decision-maker—are generally held not to constitute "'sufficient evidence to make out a case of employment discrimination,'" even a single stray remark "may '"bear a more ominous significance" when considered within the totality of all the evidence.'" *Id.* (quoting *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000)). Based on the totality of the circumstances, a reasonable juror could easily conclude that the alleged remarks were circumstantial evidence of discrimination.

There are numerous issues of material fact which a reasonable juror might decide in Ms. Lafferty's favor[3]; as a result, Defendants have not met their burden and summary judgment is inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Accordingly, Defendants' Motion for Summary Judgment [doc. # 96] is denied insofar as it requests the Court to dismiss Ms. Lafferty's claims of pregnancy discrimination under Title VII and CFEPA.[4]

## V.

### A.

Defendants maintain that Ms. Lafferty cannot bring suit against Mr. Nicola in his individual capacity, as she failed to name him in her CHRO complaint. This Court is barred from asserting subject matter jurisdiction over a Title VII or CFEPA claim where the plaintiff has failed to exhaust his or her administrative options. *See* 42 U.S.C. § 2000e-5(e); Conn. Gen. Stat. § 46a-101(a).

Ms. Lafferty responds that her omission is cured through the "identity of interests" doctrine. This doctrine creates "an exception to the general rule that a defendant must be named in the EEOC complaint. . . . [It] permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in

---

[3] Because this evidence discussed here is sufficient for a reasonable jury to find that Ms. Lafferty's termination was based at least in part on unlawful discrimination, the Court need not now address the admissibility of the allegations that Defendants discriminated against other female employees shortly after they gave birth.

[4] The Court's decision on this issue is bolstered by CFEPA's text, which provides that when an employee on leave due to pregnancy signals an intent to return and the employer's circumstances have not changed in a way that would make holding the position impossible or unreasonable, an employer may not "fail or refuse to reinstate the employee to her original job or to an equivalent position with equivalent pay." Conn. Gen. Stat. § 46a-60(a)(7)(D). A reasonable juror could conclude that Ms. Lafferty's June 6, 2007 letter signaled her intent to return, that Defendants' circumstances had not significantly changed, and therefore that Defendants' intention not to reinstate Ms. Lafferty constituted a CFEPA violation.

the administrative charge." *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991). In determining

if the unnamed parties in an administrative complaint have an identity of interest with the named

parties, a court should consider:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence in the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 209-10 (alteration in original). Although the first factor weighs heavily against Ms.

Lafferty, the remaining factors favor a finding that Mr. Nicola and OSN share an identity of

interests. *See Cook v. Arrowsmith Shelbourne, Inc.*, 69 F.3d 1235, 1242 (2d Cir. 1995) (finding

that a similar breakdown of the factors weighed in favor of allowing the plaintiff's claims to

proceed).

    Based on these factors alone, the Court would be inclined to find that Ms. Lafferty's

complaint against Mr. Nicola is not barred for failure to exhaust administrative remedies.

However, the question remains of whether Ms. Lafferty has the right to employ the "identity of

interests" doctrine at all: the doctrine appears to have been originally adopted in the context of

evaluating a *pro se* litigant's administrative filing, *see Johnson*, 931 F.2d at 209, and Ms.

Lafferty does not dispute that she was represented by counsel when she filed her CHRO

complaint.

    The Second Circuit has never explicitly reached the question of whether a party must

have had *pro se* status at the time he or she filed an administrative complaint in order to take

advantage of the "identity of interests" test, and district courts in this Circuit have split in

answering it. *See Consolmagno v. Hosp. of St. Raphael*, No. 3:11cv109 (PCD), 2011 WL 4804774, at *7 n.14 (D. Conn. Oct. 11, 2011) (citing cases); *Olvera-Morales v. Sterling Onions, Inc.*, 322 F. Supp. 2d 211, 216-17 (N.D.N.Y. 2004) (citing cases).

If anything, the majority of courts seem to favor a finding that the "identity of interest" doctrine applies only to a *pro se* filer, especially as *Johnson* took "a flexible stance in interpreting Title VII's procedural provisions" precisely because such complaints "generally are filed by parties not versed in the vagaries of Title VII and its jurisdictional and pleading requirements." 931 F.2d at 209 (quotation marks omitted). This reasoning, permitting an exception to the statutory rule only for *pro se* administrative filings, would apply equally to Ms. Lafferty's CFEPA claim; as Ms. Lafferty was represented by counsel when she filed her CHRO complaint, the "identity of interests" doctrine may not allow the court to ignore her failure to name Mr. Nicola. *See, e.g., Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 275 (D. Conn. 2010) ("Because the 'identity of interest' exception is intended to protect parties not versed in employment discrimination statutes, such as [Title VII] and CFEPA, the exception only applies to *pro se* filings with the relevant administrative agencies.").

This Court has never previously addressed this issue, and as it finds alternative grounds for dismissing Ms. Lafferty's Title VII and CFEPA claims against Mr. Nicola as an individual, it need not do so here.

## B.

Under established Second Circuit case law, Title VII imposes liability only on employer-entities (as opposed to individual employers) who unlawfully discriminate. "Title VII defines 'employer' in relevant part as 'a person engaged in an industry affecting commerce who has fifteen or more employees . . . **and any agent of such a person**.'" *Tomka v. Seiler Corp.*, 66 F.3d

1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (quoting 42 U.S.C. 2000e(b)) (emphasis in original). The Second Circuit has interpreted the statutory text to mean that "individuals are not subject to liability under Title VII." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220-21 (2d Cir. 2004) (quotation marks omitted). Mr. Nicola is therefore not subject to individual liability under Title VII, *see id.*, and for substantially similar reasons, Mr. Nicola is not subject to individual liability under CFEPA, *see Perodeau v. City of Hartford*, 259 Conn. 729, 743-44 (2002).

1.

The parties agree that Title VII does not impose individual liability on Mr. Nicola, but Ms. Lafferty attempts to nonetheless render him individually liable through the "alter ego" doctrine. This approach has proven successful in some courts. For example, a Puerto Rican district court found that, "[u]nder the alter-ego doctrine, a supervisor may be held liable under Title VII as an 'employer' when 'the supervisor's role is more than that of a mere supervisor but is actually identical to that of the employer.'" *Santiago v. Lloyd*, 33 F. Supp. 2d 99, 103-04 (D.P.R. 1998) (quoting *Curcio v. Chinn Enters., Inc.*, 887 F. Supp. 190, 193-94 (N.D. Ill. 1995) (acknowledging that the Seventh Circuit's dicta did not support its conclusion, but finding in the absence of firm precedent that an individual could be held liable under Title VII through the alter ego doctrine)). Defendants, unsurprisingly, counter with case law finding that the alter ego doctrine may not be used in this way. Neither the parties nor the Court identified any cases directly on point within this Circuit.

Courts will generally respect the corporate form; the usual purpose of the alter ego doctrine is to prevent an individual from employing the corporate form as a shield against liability for unlawful actions. Ms. Lafferty argues that, by terminating her employment, Mr.

18

Nicola unlawfully discriminated against her and is now attempting to avoid individual liability by hiding behind OSN's corporate form.

The Court disagrees: the crucial point here is that Mr. Nicola allegedly discriminated against Ms. Lafferty *in his role as her employer*. Ms. Lafferty acknowledges that her allegations are based primarily on her perception of how OSN was run, *see* Pl.'s Statement of Material Facts [doc. # 110] at 30 ¶ 108, and does not provide any documentary evidence that Mr. Nicola abused the corporate form. Even if Mr. Nicola is the principal and single shareholder of the corporation, absent evidence that he is inappropriately taking advantage of the corporate form, he has the right to enjoy the corporate form's protections for actions taken in his role as President.

Another argument against allowing alter ego liability—and the primary argument discussed in the only appellate cases addressing the question—focuses on the statutory text and the lack of any provision for alter ego liability. *See Dearth v. Collins*, 441 F.3d 931, 933-34 (11th Cir. 2006) (finding, after discussing the statute, that the alter ego doctrine does not create an exception to the rule against individual employee liability in Title VII cases); *Worth v. Tyer*, 276 F.3d 249, 262 (7th Cir. 2001) (noting that Congress's intent in drafting Title VII would tend to negate alter ego liability for individuals); *see also Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 200 (D. Conn. 2000) (noting that district courts are increasingly disallowing official capacity claims against supervisors because *Tomka* and Title VII's language compel a holding that only employer-entities are liable under Title VII). This Court finds this argument persuasive, not least because the Second Circuit relied on both the statutory text and congressional intent in deciding that Congress never intended liability to run against individuals. *See Tomka*, 66 F.3d at 1313-15.

Arguments favoring allowing alter ego liability focus on Title VII's remedial intentions, insofar as increasing liability would increase the likelihood of compliance. However, the Court finds persuasive the Seventh Circuit's reasoning in a comparable case regarding whether it should find that there was individual liability under the alter ego doctrine in an ADA suit:

> The employing entity is still liable, and that entity and its managers have the proper incentives to adequately discipline wayward employees, as well as to instruct and train employees to avoid actions that might impose liability. It is true that increasing the number of potentially liable defendants would increase deterrence, as businesses put more resources into avoiding liability and plaintiffs saw more potentially liable parties and had a greater incentive to sue in marginal cases. But Congress has struck a balance between deterrence and societal cost, and we will not upset that balance. We do not doubt that the employment discrimination statutes have broad remedial purposes and should be interpreted liberally, but that cannot trump the narrow, focused conclusion we draw from the structure and logic of the statutes. A liberal construction does not mean one that flies in the face of the structure of the statute.

*EEOC v. AIC Sec. Invs., Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995) (citations omitted).

The Second Circuit has held that individual employers should not be held liable under Title VII. *See Tomka*, 66 F.3d 1295. Employing the alter ego doctrine to accomplish the same result would undermine the purpose of the doctrine and constitute an end run around the *Tomka* decision. Taking into account the fact that OSN has posted a bond for $130,000—an amount reasonably related to Ms. Lafferty's alleged damages—and that Ms. Lafferty has offered no evidence that Mr. Nicola or previous partners abused OSN's corporate form, there is no need to employ the alter ego doctrine to hold Mr. Nicola personally liable for actions he took as OSN's President.

### 2.

Connecticut courts have not ruled out the possibility that an alter ego claim against an individual employer or employers could stand simultaneously with a claim against an LLC employer. *See Balog v. Shelton Rests., LLC*, No. CV040084313S, 2004 WL 1965919 (Conn.

Super. Ct. Aug. 2, 2004) ("There may be circumstances where the factual allegations of a complaint can support the conclusion that an individual, who was not a coemployee, acted as an employer within the meaning of CFEPA sufficient to impose § 46a-60(a)(1) liability."). However, such claims have been struck down when a plaintiff is unable to demonstrate that alleged individual "employer" acted as such independently of the corporate employer. *See, e.g.*, *Nordby v. Anesthesia Assocs. of Torrington, LLC*, No. CV09400858S, 2010 WL 1495695, at *4 (Conn. Super. Ct. Feb. 11, 2010) (finding that claims that individuals were liable as separate employers failed because "[t]here are simply no allegations that any individual defendant doctor or doctors acted as an employer somehow separate from the LLC").

As Ms. Lafferty makes no allegations in her complaint that allow for a reasonable inference that Mr. Nicola's discriminatory actions were taken in his role as an individual employer, as opposed to in his role as President of OSN, she has failed to state a claim that he should be held individually liable under CFEPA.

Accordingly, Defendants' Motion for Summary Judgment [doc. # 96] is granted insofar as it requests that the Court bar Ms. Lafferty from holding Mr. Nicola individually liable under Title VII and CFEPA for his alleged acts of discrimination in his role as OSN's President.

## VI.

For the above reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. # 96]. Ms. Lafferty's claims against Mr. Nicola as an individual are dismissed; Ms. Lafferty's claims against OSN will proceed to trial for a jury determination. **The Clerk of the Court should remove Mr. Nicola as a defendant.**

Per the Court's Case Management Order [doc. # 76], the parties' Joint Trial Memorandum is due on February 17, 2012, thirty days from the filing of this opinion.

**IT IS SO ORDERED.**


/s/      Mark R. Kravitz
          United States District Judge


Dated at New Haven, Connecticut: **January 18, 2012.**